UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-352(1) (PJS/LIB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | MR. SCHIPMAN'S POSITION |
| | ) | REGARDING SENTENCING |
| | ) | |
| v. | ) | |
| | ) | |
| CORD CAMERON SCHIPMAN, | ) | |
| | ) | |
| Defendant. | ) | |

Thirty-four-year-old Cord Cameron Schipman will be before the Court because he produced a sexually explicit photograph of ███████████. For this conduct, he faces a mandatory minimum term of imprisonment of fifteen-years and has an advisory guideline range of 210 to 262 months. For reasons discussed below, Mr. Schipman respectfully requests a sentence of fifteen long years, the mandatory minimum. Fifteen years in prison followed by ten years of supervision is fair and reasonable and will implement the purposes of sentencing.

**ARUGUMENT**

## I.      Section 3553(a) Factors

### A.      Offense Conduct

In September 2023, Mr. Schipman was extremely drunk and chatting with others about child pornography on the social media platform "Kik." To access these chatrooms, Mr. Schipman was required to send three non-pornographic

photographs ███████████████████████████████████████████████████ ████████. His discussions were lewd in nature and involved others sending him child pornography images. But, for the first several weeks, Mr. Schipman did not create or distribute any child pornographic images of his own.

That changed when, on September 26, 2023, an undercover FBI agent stationed in Alabama joined the chatroom and sent Mr. Schipman a direct message ████████████████████. Referring to a non-pornographic photo Mr. Schipman had posted █████████████, the FBI agent asked Mr. Schipman, "Who's that little cutie in the bed?" After several additional drunken messages when Mr. Schipman claimed to be ██████████████████, the FBI agent requested he send "a live pic ████████████████████████████." When Mr. Schipman did not immediately respond, the undercover agent became more insistent: "Please…. If you're cool with it." At this, Mr. Schipman took the charged photo ███████████████ and sent it to the agent, as requested. The photo did not include ███████████ ████ any other identifying features. Later, Mr. Schipman sent this same photo to two other people on Kik.

Mr. Schipman is the first to admit that his offense is extremely serious. He violated ████████████████████████████████████████████ ████████████████████████████████████████. Mr. Schipman was forthright and admitted his crime the very next day, September 27, when

2

confronted by law enforcement at work.  He admitted that he had been on Kik discussing child pornography for the past few weeks and that he took the charged photo to distribute.  He also told officers they would find more than 10 other images of child pornography that he received on Kik.  He explained that he felt immense shame about what he did and decided to delete the photo ███████████ ███████████████.  He told officers that single pornographic photo was the only one he had taken ████████████ which is consistent with what officers found while searching Mr. Schipman's electronics.

Mr. Schipman feels absolutely terrible about what he did ███████████ ████████.  He understands the long-term consequences that can follow the trauma and devastation he caused.  Acknowledging his very serious offense, how much punishment is warranted?  Respectfully, Mr. Schipman submits that a fifteen-year federal prison sentence followed by supervision is sufficient for someone who has never before been to jail or prison, expressed true remorse and admitted his crime the very next day, and whose conduct was in part the product of ███████████████████████ and his resulting debilitating addiction to alcohol.

### B.    Personal History and Characteristics

Mr. Schipman is a 34-year-old man who committed a serious sex-related offense.  But he is far more than the worst thing he has ever done.  He grew up

with his parents and younger sister in rural Montana.  His father was an alcoholic and his mother worked multiple jobs to try to make ends meet.  Owing to his father's excessive drinking, the family was poor and frequently went without adequate food, electricity, or running water.  Between his father's alcoholism and mother's overtime work schedule, Mr. Schipman was largely left to fend for himself at home.

Whenever his father drank, which was nearly every day, he would verbally lash out at Mr. Schipman, put him down, and tell him he would never amount to anything.  Mr. Schipman began to internalize this abuse and lost motivation in school.  He became anxious and routinely suffered panic attacks.  In the fifth grade, he was diagnosed with Attention-Deficit Hyperactivity Disorder, but his father did not allow him to take any medication.  Mr. Schipman struggled in school both academically and behaviorally, leading to multiple suspensions.

Mr. Schipman also suffered ████████████ as a young boy.  He grew up near relatives, ██████████████████████.  Between the ages of 10 and 12, Mr. Schipman spent time at his grandmother's home, ████████ ████████ while his mother worked long hours.  ████████████████████████ ████████████████.  Mr. Schipman struggled with the ensuing guilt and shame, which led to his regularly consuming alcohol at the incredibly

young age of 10.  Mr. Schipman learned that alcohol could numb the panic and anxiety from his ███████████████████ also helped him escape his father's verbal abuse.

Despite his ongoing addiction to alcohol and struggles in school, Mr. Schipman managed to graduate from high school in 2009 with a 2.5 GPA.  He did not have many job prospects in rural Montana following graduation, so he decided to move to Wyoming to work in the coal mines.  When this work proved treacherous and his father began having strokes, Mr. Schipman returned to Montana to help his parents and work as a Pepsi delivery driver.  It was around this time when Mr. Schipman began dating his mother's longtime friend, Katherine, who is 15 years his senior.

As detailed in the PSR, Mr. Schipman's relationship with Katherine "was not the greatest," and his ongoing alcoholism was partly to blame.  The couple have two children together, ███████████████████.  Just like Mr. Schipman's father did growing up, ███████████████████████ ██████████████████.  Resentment festered, and the relationship became toxic.  This unfortunately led Mr. Schipman further into alcoholism and drug dependence.  Around the time of his offense in this case, Mr. Schipman was drinking more than a case of beer (24 cans) and a half bottle of hard liquor *every day* after work.  He was also sneaking Katherine's oxycodone pills, which she had

for back pain.  Mr. Schipman's addiction became so severe that Katherine repeatedly threatened to take him a treatment center in Duluth.  But Mr. Schipman always resisted.  Now, with the benefit of hindsight, Mr. Schipman wishes he would have let Katherine take him to treatment.  He believes that if he had done so, he would not have committed this offense.  In the dense fog of alcohol and drugs to numb his own childhood trauma, ████████████████████.  He feels fortunate to have had the opportunity to address these issues while on pretrial release.

### C.    Pretrial Release and Pretrial Custody

Following his arrest in this case, Mr. Schipman felt an immense sense of shame and self-hatred.  Having regained his sobriety in custody,[1] he could not believe what he did ████████████████████.  A███████████████ ███████████.  Mr. Schipman struggled with the horror of what he caused.

To his credit, Mr. Schipman realized the connection between his own trauma and addiction and his offense.  Rather than spin, wallow, or blame others, Mr. Schipman dedicated himself to getting better.  He knew he could never take back what he had done to his family—he could never make "things right."  But

---

[1] On September 27, 2023, Mr. Schipman was arrested at his work and charged in Carlton County on equivalent state charges.  While still in state custody, he made his initial appearance in this matter on September 29, 2023, before being released to pretrial supervision on October 3, 2023.

the next best thing he could do is focus on his sobriety and mental health. He felt

incredibly fortunate when the Court allowed him to be released to RS Eden in St.

Paul, where he could undergo intensive treatment.

During his time in pretrial release between October 2023 and June 2024, Mr.

Schipman successfully completed substance-abuse and mental-health treatment in

the community. This was the first time in his life that he ever sought treatment for

his addiction. In March 2024, Mr. Schipman graduated NuWay's intensive

outpatient program after finishing 335 hours of treatment. He also attended

weekly Alcoholics Anonymous meetings, Bible studies, and mass at Immanuel

Baptist Church in St. Paul. Mr. Schipman participated in weekly individual

therapy sessions with Minnesota Trauma Recovery Institute. There, he opened up

about ███████████████████████████████. He was diagnosed with PTSD

and began building positive coping skills that do not involve the use of alcohol or

drugs. During his entire eight months on pretrial release, Mr. Schipman did

exactly as this Court required and incurred absolutely no violations of any kind.

Mr. Schipman was taken into custody upon pleading guilty in this case. But

he did not let that stop his ongoing treatment and recovery. As soon as he was

able, Mr. Schipman voluntarily enrolled in multiple group therapy sessions at the

Sherburne County Jail. He has since completed the Psychoeducation Group,

comprised of both cognitive behavioral therapy and dialectical behavioral

therapy, the CBT Group, and the Life Skills Group. While the programming at Sherburne is more limited than that available in the BOP, Mr. Schipman made the most of his time in custody so far. He plans to pursue whatever treatment is available to him in the BOP, including the voluntary sex offender treatment. Mr. Schipman's insight into the factors leading up to his offense conduct, as well as his well-documented commitment to treatment and self-improvement, show that a sentence of fifteen years in federal prison is sufficient. Fifteen years is particularly a long sentence for someone who has never before been to prison.

### D.    Lack of Criminal History

Mr. Schipman is in criminal history category I. His only other case is related to this case in Carlton County. That case remains pending. Mr. Schipman is not a habitual offender and prior to this case he had not served any time in custody. By serving a long, fifteen-year sentence in a federal prison, he will be deterred. He will also be deterred because he will be receiving treatment for his alcohol addiction and his sexual behavior.

### E.    Psychosexual Evaluation

Elizabeth Griffin completed a psychosexual evaluation in this case. She reviewed the discovery and the state complaint. She interviewed Mr. Schipman and administered a slew of tests to arrive at her findings. The report is attached to this pleading. The report summarizes Mr. Schimpan's background including

his family, school, work, social life, mental health, and substance abuse. The report moves to physiological testing and assessments. In concluding, the report makes the following findings:

- o Mr. Schipman is diagnosed with anxiety, PTSD, severe alcohol use disorder, and moderate opioid use disorder.

- o Mr. Schipman does not meet the criteria for pedophilic disorder.

- o Mr. Schipman is a low risk to reoffend if he participates in substance abuse treatment and sex offender offense-specific treatment and supervision.

- o Mr. Schipman should complete trauma informed treatment.

- o Mr. Schipman should complete the RDAP program while in prison.

This report should be used by the Court as assurance that a sentence of fifteen years in prison followed by ten years of supervision (which will including treatment) will assure the public will be safe.

### F.    How Can the Court be Assured that the Public Will be Safe

As noted above, a term of fifteen years in federal prison sufficiently protects the public from Mr. Schipman. While incarcerated, he will be separated from society and hopefully receive therapy to address the cause of his behavior. Mr. Schipman never wants to hurt anyone ever again. Should he receive a fifteen-year sentence, he will be in his late-forties when he is released from prison. Mr. Schipman is an appropriate candidate to receive treatment in prison; treatment that will equip him with the resources he needs to correct his behavior and

addiction issues.    The psychosexual report recommends such treatment. Moreover, he will continue to receive treatment after his release from prison.  Mr. Schipman is committed to entering and completing any and all BOP programs to reduce his likelihood of reoffending.

The BOP has numerous programs for sex offenders that have been found to be highly efficient at reducing the rate of recidivism after release.[2]  Mr. Schipman qualifies for and will have access to individualized treatment ranging from adverse conditioning to vocational training, as well as transition services for reentry into society.  According to the BOP, "the Bureau is committed to providing evidence-based psychology treatment programs to sexual offenders."[3]  Further, "sex offender treatment programs, like all Bureau psychology treatment programs, are designed on the most recent research and evidence-based practices, ensuring effective treatment programs."[4]  In-prison therapy coupled with a support system will benefit Mr. Schipman and reduce the possibility of reoffending.  Crucially, Mr. Schipman wants treatment to assist him with his issues and lower his risk of recidivism.

---

[2] U.S. Bureau of Prisons, "Sex Offender Programs," February 15, 2013, retrieved from https://www.bop.gov/policy/progstat/5324_010.pdf.

[3] *Id.*

[4] *Id.*

### G.    Respect for the Law, Just Punishment and Adequate Deterrence

A fifteen-year sentence would maintain respect for the law.  Requiring Mr. Schipman to serve fifteen years demonstrates that the government takes creating child pornography seriously and provides adequate time for Mr. Schipman to be away from society and benefit from in-custody sexual and mental health treatment.  Given his age and his history, a sentence of fifteen years is just punishment.  As to specific deterrence, fifteen years is sufficient because it combines punitive deterrence with the corrective deterrence that intensive supervised release will provide.

If there is any doubt about Mr. Schipman's recidivism upon release, he will still be under the jurisdiction of the federal courts (and state courts) for many years.  This is good for a number of reasons:

1)    Mr. Schipman will be able to get the housing and community support he will need from U.S. Probation;

2)    a term of supervised release will ensure Mr. Schipman is employed when he is living in society again,

3)    continued mental health therapy will assist in facing his past;

4)    the extra accountability will ensure that he establishes a stable and strong, law-abiding life that will keep him from returning to prison; and

5)    the required treatment needed for sexual offenders will ensure his stability.

Mr. Schipman does not need more than fifteen years in prison for the purpose of deterrence. Again, he urges the Court to impose no more than fifteen years' imprisonment followed by ten years of supervision.

### H.    Other Defendants

Counsel reviewed ECF files on cases involving production of child pornography where the minor was a relative.  Although it is difficult to compare defendants given their individual backgrounds, counsel reviewed government position pleadings, criminal complaints and or plea agreements to gain knowledge about the cases.  In *United States v. Chedor TV*, 23-207 (ECT), TV was sexually abusing a child in his care starting at age 10.  TV began taking explicit videos of the minor over the course of time.  He sent the minor sexually explicit videos.  He received a sentence of 240 months followed by 10 years of supervision.  In *United States v. Jason Lee,* 23-128 (DWF), Lee sexually abused his four-year old niece and took a video of the abuse.  There was indication he had done the same to another niece.  He received a sentence of fifteen years followed by 15 years of supervision.  In *United States v. Raab*, 22-101 (KMM), Raab took a sexually explicit video of their 11-year child and then sent it to a codefendant.  When comparing, Mr. Schipman's conduct with other defendants' conduct, it is important to note the following: Mr. Schipman's case involved one minor and occurred in one day, not over a span of months of years.  He has no prior convictions for sexual abuse or criminal history.

He candidly admitted his actions. And he pleaded guilty quickly. For these reasons, a sentence of fifteen years is justified.

## II.    Financial

### A. Restitution

It does not appear that minor or their family has requested restitution. Because Mr. Schipman possessed child pornography, he has agreed to pay a total of $8,000 to two known-series victims. No other restitution requests have been made known to counsel.

### B. Fine and Special Assessments

Mr. Schipman is requesting no fine be imposed as he will have $8000 to pay in restitution. As of now, he does not have the ability to pay a fine. Further, he will not be able to pay the special assessments pursuant JVT Act of 2015, which requires the Court to assess a special assessment in the amount of $5,000 on any non-indigent person. The provisions of the AVA Act of 2018 require a special assessment of up to $50,000 but requires the Court to examine the 3553(a) factors. To determine the amount of the assessment within the authorized range, AVAA instructs that a sentencing court "shall consider the factors set forth in sections 3553(a) and 3572." 18 U.S.C. § 2259A(c). Mr. Schipman submits that neither special assessment should be applied.

Mr. Schipman is indigent and does not have the ability to pay the assessment now or in the future.  Although he anticipates he will go back to work, he is not sure what type of employment he will have given his conviction.  Indeed, he struggled to find work while in pretrial release, owing to his then-pending charges.  Respectfully, he requests that the $5,000 assessment not be imposed, the $50,000 assessment not be applied, and no fine be imposed.  Further, it will be important for Mr. Schipman to concentrate on his treatment rather than being drowned in debt when he is released.  As explained above, he has already agreed to pay $8,000 in restitution and he understands he will have to pay a $100 special assessment.

## III.    Supervision Following Prison

### A. Term of Supervision

Pursuant to 18 U.S.C. 3583(k), the Court shall impose a term of supervised release (SR) of 5 years to life.  Mr. Schipman requests a 10-year term of supervision. The length of SR term within those parameters is governed by § 3583(c), which in turn references *most* of the sentencing factors contained in § 3553(a).  Supervision is meant to serve rehabilitative ends and smooth the transition from prison to free society, not to heap additional punishment after a prison term ends.  "Still, supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty."  *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018).

The ten years of supervision following fifteen years in federal prison is enough. The term will allow probation to proactively monitor Mr. Schipman and assist in his treatment needs.  As outlined in the PSR, Mr. Schipman does not object to the conditions of supervision.  It is important to note that Mr. Schipman will register as a predatory offender for life.

## CONCLUSION

Mr. Schipman recognizes his crime is serious and he took responsibility his actions from the start.  His criminal behavior is so serious that he is facing a mandatory minimum sentence of fifteen years in federal prison.  He is willing and wanting to continue with his mental health therapy and substance abuse treatment while in prison and beyond.  ███████████████████████████████ ████████████████████████████.  A sentence of fifteen years in prison followed by ten years of supervision is sufficient.

Dated: November 7, 2024                    Respectfully Submitted by:

                                           *s/ Matthew Deates*
                                           _____
                                           MATTHEW DEATES
                                           Attorney No. 0400318
                                           MANNY K. ATWAL
                                           Attorney No. 282029
                                           Attorneys for Mr. Schipman
                                           US Courthouse 107
                                           300 South Fourth Street
                                           Minneapolis, MN 55415

# Griffin Counseling and Consulting
## 5115 Excelsior Boulevard, #450
## MN License #860/NC License #2606
## St. Louis Park, MN 55416
## 952-451-0771

Psychosexual Evaluation

for

Cord Cameron Schipman

**Report Authors**

Griffin Counseling and Consulting specializes in training, consultation, and evaluation services for problematic sexual behavior. The company's founder, Elizabeth Griffin, MA, LMFT, has forty years of experience addressing problematic sexual behavior, including offline and online sexual offense behavior. Her curriculum vitae is attached to this report.

**Introduction**

The following is a psychosexual evaluation for Cord Cameron Schipman. Mr. Schipman is a 34-year-old Causcian male (DOB: ▮▮▮▮▮▮▮). On June 7, 2024, Mr. Schipman pleaded guilty to Production and Attempted Production of Child Pornography in violation of 18 USC § 2251(a), (e).

Mr. Schipman was arrested on September 9, 2023, and released on a personal recognizance bond with pretrial supervision on October 3, 2023. He lived at RS Eden in St. Paul, Minnesota, until his change of plea hearing on June 7, 2024, with no issues or concerns. Since being remanded into custody, Mr. Schipman has not experienced any institutional adjustment issues.

**Evaluation Procedures**

Mr. Schipman was interviewed by Elizabeth Griffin, MA, LMFT, on March 29, 2024. As part of the psychosexual evaluation, Mr. Schipman was administered the Minnesota Multiphasic Personality Inventory (MMPI-3), which was interpreted by Jerry Fjerkenstad, a licensed psychologist associated with Griffin Counseling and Consulting. Additionally, Mr. Schipman was administered the Trauma Symptom Inventory (TSI-2), the Substance Abuse Subtle Screening Inventory (SASSI), and the LOOK Assessment of Sexual Interest. Mr. Schipman was also scored on the Adverse Child Experiences (ACE) Scale, the Screening Scale for Pedophilic Interest, the Static-99R, the Static 2002R, and the STABLE 2007.

Case documents reviewed included the following:

- Federal Bureau of Investigation Written Transcript of Interview with Defendant
- Screen Capture of Kik Conversation Between Defendant and Another Kik User
- State of Minnesota County of Carlton Complaint
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- Calton County Jail Written Transcripts of Visits Between Defendant and His Parents
- Federal Bureau of Investigation Written Transcript of Interview with Defendant's Partner

Mr. Schipman provided his informed consent to voluntarily participate in the evaluation, understanding that the outcome would be provided to his attorney and may be presented to the Court as part of his legal proceedings.

**Mental Status Examination**

Mr. Schipman is a 34-year-old man who appeared his stated age. His hygiene and grooming were unremarkable. His posture was relaxed, and he displayed no unusual or involuntary movements. He was oriented in all areas. He was alert, polite, and cooperative. He maintained regular eye contact. There were no apparent impairments in his ability to understand or express himself. He did not demonstrate apparent difficulties with attention, memory, or concentration. His thought processes were linear and goal-directed. Overall, he presented as psychiatrically stable.

## Background and History

Andrews and Bonta (2010) identified five areas of an individual's background and history that should be considered when determining their risk for sexual recidivism: (a) relationships, (b) school and work, (c) leisure and recreation, (d) mental health issues, and (e) antisociality. The following sections provide information regarding Mr. Schipman's background and history relative to these areas. An additional section regarding Mr. Schipman's sexual offense behavior is included.

*Relationships (Family/Friends/Sexual/Romantic)*

*Family*: Mr. Schipman was born and raised in Montana. His parents have been married for 35 years and live in Cloquet, Minnesota. Mr. Schipman has one younger sister who lives in Fargo, North Dakota.

Mr. Schipman described his childhood as "a little tough at times." His father was a "raging alcoholic" who was often "out drinking." He stated his father was emotionally abusive - swearing, name-calling, yelling, and frequently telling Mr. Schipman that he "would never amount to anything." Mr. Schipman stated that his mother and sister were also victims of his father's verbal and emotional abuse, which was difficult to handle. He recalled trying to protect his mother and sister from his father's abusive behavior. Mr. Schipman stated that as he got older, his father would throw him around physically, but acknowledged that his father was never physically abusive to Mr. Schipman's mother or sister.

Mr. Schipman reported that despite his father's drinking and abusive behavior, there were "good" times. He recalled going fishing, hunting, playing pool together, and helping his father with chores. Mr. Schipman stated he also had a close relationship with his mother, who tried her best to "make everything okay."

Mr. Schipman shared that his family struggled financially. He remembered going to bed hungry and times when the family had no electricity or telephone service due to unpaid bills. He stated that his mother often worked two jobs and was "not around a lot," and his father was "always out drinking," Mr. Schipman was often left alone to care for his younger sister.

Mr. Schipman noted that his parents have always "done their best" to be as supportive as possible. He stated that while his father continues to drink and engage in verbally abusive

behavior, his relationship with his parents has "grown exponentially" as a result of Mr. Schipman's sobriety. ████████████████████████████████████████
██████████████████████████████████

*Romantic:* When Mr. Schipman was approximately 20 years old, he became involved with a woman, Katherine, who was 17 years older. He reported that Katherine was a friend of his mother, whom he had known since he was eight years old. Mr. Schipman and Katherine never married but were together for 12 years until his arrest for the instant offense. ████████████████████████████████████████████████████
█████████████████████████████

Mr. Schipman admitted that his relationship with Katherine "was not great," in large part due to his alcohol use. He reported that the relationship deteriorated during the COVID-19 pandemic when his drinking increased significantly. Mr. Schipman shared that prior to his arrest, the couple was primarily "staying together for the children."

*Friends:* Mr. Schipman reported that he was "never the one to go out and make friends." He noted that he was friendly with his peers at school but acknowledged that was not difficult since he attended a school with only five peers in his class when he was younger and only two peers in his class in high school

 Mr. Schipman stated that he did not "get together" with friends outside of school due to his family situation. After high school, he reported " hanging out" with family and cousins. He shared that while he got along with people at work, he did not have friendships with coworkers outside of work.

Mr. Schipman shared that as an adult, he was not the type of drinker to go to a bar and socialize but rather a drinker who came home and drank alone or with his girlfriend. He indicated he had two "drinking friends" who would come over to his house and drink with him on occasion.

*School and Work*

Mr. Schipman acknowledged that he "did not love school," and as a child, he always wanted to be outside, running around and "hanging out with the animals." He was diagnosed with ADHD in fifth grade and prescribed medication; however, his father was "not a fan of medication," so Mr. Schipman was not allowed to take the ADHD medication.

Mr. Schipman recalled that school improved in seventh grade when he played on the basketball team. He enjoyed basketball and wanted to stay on the team, so his grades improved "just enough." He played basketball through his senior year of high school. In 2009, Mr. Schipman graduated from Westby High School in Westby, Montana.

Mr. Schipman reported that in high school, he worked as a custodian at the high school and, during the summer, worked for the city cutting grass. After high school, he went to work for his uncle in the coal mines in Wyoming and then went to work for Pepsi, training to be a delivery

driver. He was terminated from Pepsi after wrecking his truck as a result of driving while intoxicated. Mr. Schipman worked various "odd" jobs over the years. For the six years prior to his arrest, Mr. Schipman worked for Cirrus Aircraft, Hermantown, Minnesota. Mr. Schipman reported he liked his job and never experienced any issues with supervisors or coworkers.

While incarcerated, Mr. Schipman would like to take advantage of vocational and educational opportunities. He hopes to develop specific vocational skills that will assist in his transition back to the community.

*Leisure and Recreation*

Mr. Schipman acknowledged that much of his leisure time centered around drinking. He noted that while he enjoyed hunting, fishing, and camping, he rarely engaged in these activities as his drinking increased over the years.

While on Pretrial Supervision, Mr. Schipman attended Immanuel Baptist Church at least once, if not more often, per week. He stated that "returning to faith" is assisting him with maintaining his sobriety and helping him to cope with the guilt and shame he is experiencing as the result of his sexual offense behavior.

*Antisociality (History, Associated Cognitions)*

Mr. Schipman has no juvenile or adult history of misconduct, aggression, violence, or reckless disregard for the safety of others. He has no official record of prior criminal charges or convictions as a juvenile or adult, though Mr. Shipman recalled two arrests for driving while intoxicated. Mr. Schipman does not have a history of gang involvement or association with individuals involved in a criminal lifestyle. Additionally, he does not demonstrate criminal attitudes or beliefs and does not blame others for his problems.

*Mental Health Issues (Mood Disorders, Substance Abuse, etc.*

In 2022, Mr. Schipman was diagnosed with generalized anxiety disorder at the Community Memorial Hospital Raiter Family Clinic in Cloquet, Minnesota, after experiencing symptoms of a panic attack. However, Mr. Schipman provided a history of anxiety starting as a young child. He attributed the onset of his anxiety to the stressors of his childhood ███████████ ███████████

███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

After the abuse, Mr. Schipman described a worsening of his symptoms of anxiety, which included clammy hands, excessive sweating, and a racing heartbeat. ███████████ being around others made him nervous, and as a result, he was more socially inhibited. Mr.

Schipman also shared that he began to struggle in school, both academically and behaviorally, ███████████████████████

At a young age, Mr. Schipman began to use alcohol to cope with his anxiety. He recalled smoking marijuana on occasion but stated that alcohol was his "drug of choice." Mr. Schipman's drinking impacted most areas of his life, but especially his relationship with his girlfriend. He noted that his drinking was an ongoing source of conflict with his girlfriend.
Mr. Schipman recounted that his drinking significantly increased during COVID-19 and that by 2023, he was drinking one-half liter of hard liquor per day and approximately 24 beers per day.

In addition to his alcohol use, Mr. Schipman noted that after wrecking his truck in 2011 as the result of driving intoxicated, he was prescribed oxycodone for his injuries. It was during this time that Mr. Schipman began to misuse oxycodone. He reported his girlfriend was prescribed oxycodone and muscle relaxers for knee issues, and in recent years, he would "steal" her medication. Mr. Schipman acknowledged that starting in 2021, he was combining excess alcohol use with oxycodone and muscle relaxers up until his arrest in 2023.

After his arrest, Mr. Schipman received a diagnosis of alcohol use disorder from RS Eden. Subsequently, he attended and successfully completed an intensive outpatient substance use program at NUWAY Alliance in St. Paul, Minnesota. He also attended Alcoholics Anonymous meetings while living at RS Eden in St. Paul, Minnesota. While incarcerated, Mr. Schipman has been attending 12-step substance use groups through the jail's in-person programming.

In addition to his substance use treatment, Mr. Schipman attended individual therapy while living at RS Eden with Zach Bodeau, MA, at the Minnesota Trauma Recovery Institute. According to Mr. Bodeau, Mr. Schipman demonstrated motivation to work on his mental health related to both past lived experiences and circumstances related to his legal situation. Mr. Bodeau diagnosed Mr. Schipman with posttraumatic stress disorder (PTSD), stemming from the ██████████████████████████████████.

Mr. Schipman reported that he has been sober since his arrest. He shared that sobriety had changed his life. He hopes to attend the Residential Drug Abuse Program (RDAP) while incarcerated.

*Sexual Offense Behavior*

Mr. Schipman admitted to his sexually abusive behavior, as outlined in the case discovery. He stated that while there is no excuse for his sexually offending behavior, he believes his alcohol and drug use played a significant role in his decision-making. He noted that since "getting sober," he is ashamed and horrified at his behavior and devastated when he thinks of the consequences of his behavior ████████████

Mr. Schipman took full responsibility for his sexual offense behavior and stated he hopes to attend voluntary sex offense-specific treatment while incarcerated.

**Psychological Testing and Assessments**

*Minnesota Multiphasic Personality Inventory (MMPI-3)*

Mr. Schipman was administered the Minnesota Multiphasic Personality Inventory (MMPI-3). The MMPI-3 assists in forming psychiatric diagnostic impressions and assessing an individual's personality style and coping behavior. The MMPI-3 was considered valid for interpretation. Mr. Schipman responded relevantly to the test items and produced scorable responses.

According to the MMPI-3, Mr. Schipman likely experiences significant anxiety and anxiety-related problems, including panic attacks. He also presents with features of posttraumatic stress disorder (PTSD), including excessive worry, intrusive thoughts, and nightmares. The MMPI-3 notes that Mr. Schipman feels incapable of controlling his anxiety and may engage in unproductive coping responses as a result.

The psychological testing suggests that Mr. Schipman likely struggles with poor impulse control. He is sensation-seeking and can act out behaviorally when bored. These traits are exacerbated by problematic alcohol and/or drug use, including misuse of prescription medication.

Mr. Schipman's testing notes features of dependency and social anxiety. He experiences subjective incompetence and feelings of "not being good enough. He is indecisive, passive, and submissive in interpersonal relationships. The MMPI-3 indicates that Mr. Schipman is socially introverted, uncomfortable around others, and has difficulty forming close relationships.

Mr. Schipman's results on the MMPI-3 are congruent with his background and history.

*Adverse Childhood Experiences (ACE Questionnaire)*

Adverse childhood experiences are a significant risk factor for a wide range of psychological disorders and health problems throughout the life span, including substance use disorders, various types of risky behaviors, chronic health conditions, low life potential, and early death.

The ACE questionnaire identifies factors such as abuse in the home, unmarried parents, exposure to domestic violence and substance use, and incarceration of family members are predictive of criminal behavior, suggesting family dysfunction and a chaotic home environment contribute significantly to increased risk of general criminal behavior (Levenson & Socia, 2016). Child sexual abuse, emotional neglect, and domestic violence in the childhood home are significant predictors of arrests for sex crimes (Levenson et al., 2014)

Mr. Schipman received a score of five (5) on the ACE questionnaire. Scores of 4 or higher are considered highly correlated with mental, physical, and behavioral issues.

*Traumatic Symptoms Inventory (TSI-2)*

The Trauma Symptom Checklist (TSI-2) is designed to evaluate posttraumatic stress and other psychological sequelae of traumatic events. The TSI-2, 12 clinical scales, can be subsumed

under four broad categories of distress: Self Disturbance, Posttraumatic Stress, Externalization, and Somatization.

Mr. Schipman's TSI-2 was considered valid for interpretation. Mr. Schipman had clinically elevated responses on seven of the 12 clinical scales, indicating significant clinical concerns in the four board categories of distress: Self-Disturbance, Posttraumatic Stress, Externalization, and Somatization.

Mr. Schipman's significant clinical concerns within the Self Disturbance category represent a disturbed sense of self and others, with a relative inability to access an internal sense of self. This combination of difficulties may lead to problematic interaction with others, a tendency to rely on other people for information about self, and a significant susceptibility to influence by others. Additionally, an individual with clinical concerns within the Self Disturbance category often struggles with depression.

Mr. Schipman's significant clinical concerns within the Posttraumatic Stress category represent symptoms of features of an official PTSD diagnosis, such as flashbacks, nightmares, intrusive, triggered memories, cognitive or behavioral avoidance of remembering the previous traumatic events, and various dissociative symptoms. In almost all cases, individuals with clinical concerns in this category have undergone one or more significant traumas.

Mr. Schipman's significant clinical concerns within the Externalization category represent symptoms of problematic or self-destructive behaviors as a way to deal with overwhelming internal (often trauma-related) emotional states and substantially diminished or underdeveloped capacities to deal with emotions. A history of child abuse and neglect may be associated with a high score in this category. Substance abuse may be a problem, as well as excessive, inappropriate, or unsafe sexual behaviors.

Finally, Mr. Schipman's significant clinical concerns within the Somatization category indicate a general preoccupation with bodily concerns, either for psychological reasons or as a result of preoccupation with actual physical disease, dysfunction, or pain.

Mr. Schipman's TSI-2 results are congruent with his background and history, as well as the results from the psychological testing and the ACE Questionnaire.

*Pedophilic Disorder*

███████████████████████████████████████████████

█████████████████████████████████████████████

Pedophilic Disorder is defined as:

> *Recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a **prepubescent** child that occurs for at least six months and is either acted upon or causes marked distress or interpersonal difficulty (DSM-5; American Psychiatric Association).*

Case information and specialized assessment tools can assist in determining if an individual demonstrates pedophilic interest. Examining an individual's sexual behavior history, reviewing available forensic data, interpreting data from the clinical interview, and administering empirically based objective measures, such as the LOOK Assessment of Sexual Interest and the Screening Scale for Pedophilic Interest – 2 (SSPI-2), can provide information regarding an individual's sexual interest.

The LOOK Assessment of Sexual Interest (Fischer, 2014) is used to determine an individual's primary sexual interests. Sexual interest can be generally categorized into post-pubescent (adolescents and adults), pubescent children, and prepubescent children. The LOOK provides objective visual response time data that can be combined with other data to create an accurate profile of an individual's sexual interest. This information can be useful in diagnosing pedophilic disorder. The LOOK is comparable to the Abel Assessment for Sexual Interest but provides more detailed results.

On the LOOK Assessment, Mr. Schipman did not demonstrate any sexual interest in prepubescent children (male or female).

Mr. Schipman was also scored on The Screening Scale for Pedophilic Interests (SSPI-2; Seto et al., 2017). The SSPI-2 was developed as an alternative measure for adult sex offenders with one or more child victims when penile plethysmograph (PPG) testing results are unavailable. The five SSPI-2 items were drawn from clinical and empirical research on pedophilia and sexual offending. The SSPI-2 is positively associated with sexual arousal in children.

### Mr. Schipman's SSPI Scoring Summary

| Score | Item |
|-------|------|
| 0 | 1. any boy victim under 15 (0, +1) |
| 0 | 2. multiple child victims under 15 (0, +1) |
| 1 | ███████████████████████ |
| 0 | 4. any extrafamilial child victims under 15 (0, +1) |
| 1 | 5. any possession of child pornography (0, +1) |
| 2 | **Total Score** |

Mr. Schipman received a score of two (2) out of a possible score of five (5) on the SSPI-2. The combined development and validation sample indicates that 22% of sexual offenders with a score of two had greater sexual arousal to prepubescent children relative to adults. Whereas 78% of sexual offenders with a score of two (2) had greater arousal to adults relative to prepubescent children. Mr. Schipman's score of two (2) on the SSPI-2 indicates a lower likelihood of pedophilic disorder.

Mr. Shipman's LOOK Assessment and SSPI-2 results are congruent with a meta-analysis (Seto et al.,2015) that found ███████████████████ were significantly lower on atypical sexual interests (e.g., pedophilia, other paraphilias, and excessive sexual preoccupation) when compared ███████████████████████

*Additional Considerations:* Emotional congruence with prepubescent children is often considered a significant component of pedophilic disorder (McPhail et al., 2014). Emotional congruence describes an individual who demonstrates noticeable interest or investment in activities with prepubescent children, prefers the company and activities of children to adults, and appears childlike.

Mr. Schipman does not demonstrate any features or traits associated with emotional congruence with prepubescent children. ███████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

*Summary:* Based on the results of the empirically-based objective measures and Mr. Schipman's lack of emotional congruence with prepubescent children, it is the author's opinion that Mr. Schipman does not meet the criteria for pedophilic disorder.

It is often assumed that individuals who commit sexual offenses against prepubescent children are pedophilic; however, research indicates that many of these individuals do not meet the criteria for pedophilic disorder (Cantor & McPhail, 2016; Seto, 2008). Seto (2008, 2015) estimated that approximately 50% to 60% of individuals who sexually abuse prepubescent children and possess child pornography are pedophilic, while 40% to 50% are not pedophilic.

*Diagnostic Impressions*

Generalized Anxiety Disorder
-severe

Posttraumatic Stress Disorder

Alcohol Use Disorder
-severe
-in early remission in a controlled environment

Opioid Use Disorder
-moderate
-in early remission in a controlled environment

*Risk Overview*

One of the most difficult questions to answer related to sexual offense behavior is whether an individual is at risk of committing a sexual offense once released from incarceration. Decades of research have demonstrated there are three main factors that impact recidivism for individuals convicted of a sexual offense. These factors include:

    (a) A history of a past contact sexual offense,

        Based on the evidence in this case, it does not appear Mr. Schipman has a history of past contact sexual offense behavior.

(b) sexual interest and/or sexual arousal in prepubescent children,

> Based on the totality of the evidence, Mr. Schipman does not meet the criteria for pedophilic disorder.

(c) the presence of antisocial personality disorder (e.g., callousness towards others, pattern of criminal behavior, anti-authority issues, etc.; Hanson & Morton-Bourgon, 2015)

> While there is evidence to suggest Mr. Schipman demonstrates features of an antisocial personality disorder (i.e., poor impulse control, sensation seeking, substance use issues), he does not meet the criteria for antisocial personality disorder.

*Formal Risk Assessments*

The Static-99R (Harris et al., 2012) is an actuarial measure of relative risk for sexual offense recidivism. It has demonstrated moderate accuracy in ranking sex offenders according to their relative risk level. The Static-99R contains ten items, and when added together, it creates a total score. The scientific community, courts, and forensic evaluators widely accept the Static-99R.

### Mr. Schipman's Static-99R Score Summary

|  | Risk Factor | Scores |
|---|---|---|
| 1 | Age at Earliest Possible Date of Release (15 Years)<br>　　Aged 18 to 34.9　　1<br>　　Aged 35 to 39.9.　　0<br>　　**Aged 40 to 59.9　　-1**<br>　　Ages 60 or older　　-3 | -1 |
| 2 | Ever lived with a lover for at least two years? (Yes=0) | 0 |
| 3 | Index non-sexual violence, any convictions? | 0 |
| 4 | Prior non-sexual violence, any convictions? | 0 |
| 5 | Prior sex offenses? (Score range is 0-3) | 0 |
| 6 | Prior sentencing dates 4+ (excluding index)? | 0 |
| 7 | Convictions for non-contact sex offenses? | 0 |
| 8 | Any unrelated contact victims? | 0 |
| 9 | Any stranger contact victims? | 0 |
| 10 | Any male victims? | 0 |
|  | TOTAL SCORE = | -1 |

Mr. Schipman received a total score of minus one (-1) on the Static-99R, which places him in the Below Average category for risk of sexual recidivism. Men with similar scores sexually re-offend at a rate of 1.6% over five years.

Additionally, Mr. Schipman was scored on the Static-2002R. Using both the Static-99R and the Static 2002R increases the predictive validity of both instruments. Similar to the Static-99R, the Static-2002R can be used by a wide range of evaluators (e.g., psychologists, probation officers, psychiatrists, therapists) using commonly available criminal history information. The Static-2002R predicts sexual, violent, and any recidivism as well as other actuarial risk tools commonly used with sexual offenders (Hanson & Morton-Bourgon, 2009) and slightly better than Static-99R (Hanson et al., in press; Helmus, 2007)

### Mr. Schipman's Static 2002R Score Summary

| MAIN ITEM | SUB-ITEMS | SCORE |
|---|---|---|
| 1. Age at Release | *Age at earliest possible date of release*<br>18 to 34.9   2<br>35 to 39.9   1<br>40 to 59.9   0<br>60 or older  -2 | 0 |
| 2. Persistence of Sex Offending | *Prior sentencing for a sexual offense*<br>*Juvenile arrest for a sexual offense*<br>*Rate of sexual offending* | 0 |
| 3. Deviant Sexual Interests | *Prior sentencing for non-contact offense*<br>*Any male prepubescent victims*<br>*Prepubescent, unrelated victims* | 0 |
| 4. Relationship to Victims | *Any unrelated victims*<br>*Any stranger victims* | 0 |
| 5. General Criminality | *Prior involvement with criminal justice*<br>*Prior sentencing for anything*<br>*Community supervision violations*<br>*Years free prior to index offense*<br>*Prior non-sexual violent sentences* | 0 |
| | TOTAL SCORE | 0 |

Mr. Schipman received a score of zero (0) on the Static-2002R. A score of zero (0) is associated with a sexual recidivism rate of 1.3% over five years.

In addition to the Static-99R and the Static-2002R, Mr. Schipman was also scored on the STABLE 2007. The STABLE 2007 is a risk assessment instrument that measures dynamic risk factors. Dynamic risk factors are psychological, social, and emotional intrapersonal dynamics found to be correlated with sexual recidivism. Research has found these factors to be changeable with the use of specifically targeted therapeutic interventions, thereby reducing risk once treated.

The STABLE 2007 assists in predicting sexual recidivism and providing information related to treatment and supervision amenability (Hanson et al., 2007). The STABLE 2007 consists of 13

items and produces estimates of dynamic risk based on the number of dynamic risk factors present in an individual. Each dynamic risk factor can be scored as a 0, 1, or 2. Therefore, the total possible score ranges between 0 and 26. The scored items below marked with a "0" are identified as "no concern." Those items marked with a "+1" have been identified as being of "some concern," while items marked with a "+2" were identified as a "clinically significant concern."

**Mr. Schipman's Stable-2007 Scoring Summary**

| Score | Item | Score | Item |
|-------|------|-------|------|
| 0 | negative versus positive social influences | 1 | poor problem-solving skills |
| 1 | capacity for relationship stability | 0 | negative emotionality related to intervention |
| 0 | emotional identification with children | 1 | sex drive and preoccupation |
| 0 | hostility toward women | 1 | sex as coping |
| 1 | general social rejection | 0 | deviant sexual preference/interest (prepubescent children) |
| 0 | lack of concern for others | 0 | co-operation with supervision |
| 1 | impulsivity | **6** | **Total Stable-2007 Score** |

Mr. Schipman received a score of six (6) out of a possible 26 points on the STABLE 2007. A score of six (6) can be interpreted as a moderate level of dynamic risk.

Research suggests combining the results from the Static-99R and the STABLE 2007 to calculate an "overall risk level." Combining these two measures increases the validity and reliability of predicting sexual recidivism risk. Combined results classify Mr. Schipman as **low risk** compared to other sexual offenders assessed using these same measures, with a recidivism rate of 2.3% over three years.



*Risk Reducing Factors*

The research on sexual recidivism strongly indicates that risk factors can change based on life circumstances, life choices, aging, or deliberate interventions (such as attending treatment) (Hanson, 2017). It is our opinion that Mr. Schipman's risk will be further mitigated by:

(a) *The aging process*: The research on sexual offense behavior indicates Mr. Schipman's risk level will continue to decline as he ages. Starting in the early 1990s, researchers noticed that the aging process had a significant inverse relationship to recidivism rates regardless of an individual's offensive behavior (e.g., Harpur and Hare, 1994; Rowland et al., 1993). In a meta-analysis of 21 research studies (nearly 7,000 offenders), Hanson and Brussiere (1998) discovered robust inverse relationships between an individual's increasing age and a decrease in sexual recidivism. Sampson and Laub (2003), authors of one of the most important papers addressing the subject of criminal desistance as a function of age, found, "Aging out of crime is the norm, and even the most serious delinquents desist," as a result of the aging process.

Mr. Schipman will be approaching 50 years old at the earliest possible date of release, which will provide a significant decrease in concerns related to sexual recidivism.

(b) *Participation in Substance Use Treatment:* It is clear that Mr. Schipman's sexual offense behavior was influenced by his substance use disorders (alcohol/opioids) and it is clear that he needs to remain sober to ensure his success in the community and on supervised release.

The Federal Bureau of Prisons notes that drug treatment studies for prison populations find that when programs are well-designed, carefully implemented, and utilize effective practices, they are effective in reducing criminality, reducing recidivism, increasing the level of education and employment upon return to the community, and improving relationships.

Given the severity of Mr. Schipman's substance use disorders, it is recommended he be considered for the Federal Bureau of Prisons Residential Drug Abuse Program (RDAP). RDAP is the Bureau's most intensive substance use treatment program. Participants live in a unit separate from the general population and participate in half-day programming and half-day work, school, or vocational activities. RDAP is typically nine months in duration. FCI Sandstone in Minnesota houses an RDAP program.

Mr. Schipman realizes he has a significant need for substance use treatment and is amenable to attending the RDAP program if accepted.

(c) *Participation in trauma-informed sex offense-specific treatment*: Research-supported sex offense-specific treatment significantly reduces the likelihood of sexual recidivism (Gannon, 2019; Prentky et al., 2006).

Trauma-informed sex offense-specific treatment will address Mr. Schipman's child sexual abuse experiences and his dynamic risk factors identified on the STABLE 2007 (i.e., interpersonal difficulties, impulsivity, poor problem-solving skills, sexual preoccupation, and using sex to cope.)

(c) *Protective factors:* In addition to risk factors, the research also identifies "protective" factors, which assist in predicting success in treatment and in the community (De Vries et al., 2015).

The protective factors are listed below with a "✓" next to those Mr. Schipman possesses, an "✗" next to those he does not, and a "✓/✗" next to those with mixed evidence:

| | |
|---|---|
| ✓ | Healthy Sexual Interests (No Interest in Prepubescent Children/Violence) |
| ✓/✗ | Capacity for Emotional Intimacy |
| ✗/✓ | Constructive Social/Family Support |
| ✗ | Goal-Directed Living |
| ✗ | Good Problem Solving |
| ✓/✗ | Engaged in Employment/Constructive Leisure |
| ✗ | Long Term Sobriety – (No Excessive Use of Alcohol/Drugs) |
| ✓ | Hopeful, Optimistic, and Motivated Attitude to Desistance |

Other protective factors noted in the literature as critical to reducing sexual recidivism include intact cognitive functioning, housing stability, and positive attitudes toward rules and supervision (Willis et al., 2021).

Substance use treatment and trauma-informed sex offense-specific treatment will assist Mr. Schipman in strengthening his current protective factors and developing the protective factors identified as areas of need.

(d) *Supervised Release:* Placement on supervised release provides accountability and support services to ensure the success of individuals such as Mr. Schipman in the community. Supervised release is undoubtedly a deterrent to recidivism.

Given Mr. Schipman's substance use history, it is recommended he be placed on long-term supervised release. Long-term supervised release will provide him with the accountability and support services needed for him to maintain his sobriety.

*Risk Summary*

The risk assessment tools, as well as the research related to sexual offense behavior, suggest Mr. Schipman is at **low risk** for sexual recidivism. Mr. Schipman's risk for sexual recidivism will continue to decrease as a result of the aging process, participation in substance use treatment,

participation in sexual offense-specific treatment addressing his dynamic risk factors, the continued development of his protective factors, and placement on long-term supervised release.

## Summary and Recommendations

*Summary*

1. Mr. Schipman meets the criteria for the following diagnoses: (a) generalized anxiety disorder, posttraumatic stress disorder, alcohol use disorder, and opioid use disorder.

2. Based on the results of the empirically-based objective measures and Mr. Schipman's lack of emotional congruence with prepubescent children, it is the authors' opinion that Mr. Schipman does not meet the criteria for pedophilic disorder.

3. The risk assessment tools, as well as the research related to sexual offense behavior, suggest Mr. Schipman is at **low risk** for sexual recidivism. Mr. Schipman's risk for sexual recidivism will continue to decrease as a result of the aging process, participation in substance use treatment, participation in sexual offense-specific treatment addressing his dynamic risk factors, the continued development of his protective factors, and placement on long-term supervised release.

A meta-analysis (Seto et al.,2015) found that intrafamilial offenders were significantly lower on variables reflecting antisocial tendencies (e.g., criminal history, juvenile delinquency, impulsivity, substance use, and psychopathy) and atypical sexual interests (e.g., pedophilia, other paraphilias, and excessive sexual preoccupation). Additionally, intrafamilial offenders scored lower on offense-supportive attitudes and beliefs, emotional congruence with children, and interpersonal deficits.

*Recommendations*

The following recommendations are offered in Mr. Schipman's case.

1. Given the severity of Mr. Schipman's substance use disorders, it is recommended he be considered for the Federal Bureau of Prisons Residential Drug Abuse Program (RDAP).

2. It is recommended Mr. Schipman complete trauma-informed sex offense-specific treatment addressing his experiences of child sexual abuse and dynamic risk factors as identified on the STABLE 2007.

3. Given Mr. Schipman's substance use history, it is recommended he be placed on long-term supervised release. Long-term supervised release will provide him with the accountability and support services needed for him to maintain his sobriety.

Respectfully submitted,

Elizabeth Griffin, MA, LMFT
November 7, 2024